UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ALIZA ADIVI,                                                    Civil Action No. 20-4021

                            Plaintiff,

            -against-                                           **COMPLAINT**

HAND-IN-HAND DEVELOPMENT, INC.,
COMMUNITY ASSISTANCE RESOURCES &
EXTENDED SERVICES, INC. ("C.A.R.E.S."),                        JURY TRIAL DEMANDED
THE HAND IN HAND EARLY CHILDHOOD
CENTER, VANESSA ESPONDA individually,
CHANA TILSON individually, CHAIM LAX
individually, LEAH LAX individually, BETH
STATFELD individually, BATYA MOSKOWITZ
individually, and JAIME ANGULO individually,

                            Defendants.
-----------------------------------------------------------------X

   Plaintiff ALIZA ADIVI, by and through her attorneys, the DEREK SMITH LAW

GROUP, PLLC, as and for her Complaint, alleges as follows upon information and belief:

<u>**NATURE OF THE CLAIMS**</u>

1. This case arises from Defendants' repeated, flagrant, and unconscionable discrimination

  against Plaintiff on the basis of her pregnancy, their retaliation against her for complaining

  about their discriminatory practices, and the hostile work environment to which they subjected

  her, all of which ultimately culminated in her constructive discharge.

2. Defendants' conduct violated, *inter alia*, Title VII of the Civil Rights Act of 1964, 42 U.S.C.

  § 2000e *et seq,* ("Title VII"), as amended by the Pregnancy Discrimination Act of 1978, 42

  U.S.C. § 2000e(k); the New York State Human Rights Law, N.Y. Executive Law, § 290, *et*

  *seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code 8-107 *et seq.*

  ("NYCHRL"); and common law.

3. Additionally, Defendants' discriminatory, retaliatory, and harassing conduct included

demoting Plaintiff from a regular employee to per diem status, and then failing to give her timely information concerning the continuation of her health insurance benefits in violation of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 26 U.S.C. § 4980(b), 29 U.S.C. §§ 1161 *et seq*., 42 U.S.C. §§ 300bb-1 *et seq*.

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. §§ 1331 & 1343, this Court has subject matter jurisdiction over this action, as it raises federal questions under Title VII and COBRA; the Court has supplemental jurisdiction over Plaintiff's State and City law claims.

5. Plaintiff previously submitted a Charge with Equal Employment Opportunity Commission (EEOC), and was issued a Right to Sue Letter from the EEOC on or about April 13, 2020. Plaintiff has thereby satisfied all administrative prerequisites and is filing this case within ninety days of receiving the Right to Sue Letter.

6. This Court has personal jurisdiction over the corporate/entity Defendants, as they are headquartered in, have an office in, or do substantial business in, New York.

7. This Court has personal jurisdiction over the individual Defendants, as each works in, or does substantial business in, New York.

8. Venue is properly laid in this District based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the District.

## PARTIES

9. Plaintiff is an individual and resident of Florida.  At all times relevant to this action, however, she resided in New York City.

10. At all times material, Defendant HAND-IN-HAND DEVELOPMENT, INC. was and is a domestic not-for-profit corporation doing business in the State of New York with its principal place of business located at 465 Grand Street, New York, New York 10002.

11. At all times material, Defendant COMMUNITY ASSISTANCE RESOURCES AND EXTENDED SERVICES, INC. ("C.A.R.E.S.") was and is a domestic not-for-profit corporation doing business in the State of New York with its principal place of business located at the same 465 Grand Street address.  Upon information and belief, C.A.R.E.S. is the owner, parent companuy, or alter ego of HAND-IN-HAND DEVELOPMENT, INC.

12. At all times material, Defendant THE HAND IN HAND EARLY CHILDHOOD CENTER was an entity doing business in the State of New York, with its principal place of business located at 465 Grand Street.  Upon information and belief,  THE HAND IN HAND EARLY CHILDHOOD CENTER is a subdivision, subsidiary, or alter ego of HAND-IN-HAND DEVELOPMENT, INC.

13. At all times material, each of the above entity Defendants (hereinafter, collectively, the "COMPANY"), employed Plaintiff as a home-based Applied Behavior Analysis "ABA" provider.

14. According to its website, the COMPANY is a "provider of Early Intervention program services" and "contracted with New York State and New York City to deliver early intervention program services."

15. At all times material, the COMPANY employed VANESSA ESPONDA as a Field Supervisor for home-based ABA providers, and ESPONDA held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including holding the power to hire and fire Plaintiff.

16. At all times material, the COMPANY employed CHANA TILSON as a Program Director for home-based ABA providers, and TILSON held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

17. At all times material, CHAIM LAX was the COMPANY's Director, and held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

18. At all times material, LEAH LAX was the COMPANY'S Assistant Director, Deputy Director, or the equivalent; as such, she held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

19. At all times material, BETH STATFELD was the COMPANY's Chief Executive Officer and/or Chief Financial Officer, and held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

20. At all times material, BATYA MOSKOWITZ was and is the COMPANY's Human Resources (HR) Director or an equivalent position, and held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including holding the power to hire and fire Plaintiff.

21. At all times material, JAIME ANGULO was the COMPANY's HR Supervisor, and held supervisory authority over Plaintiff with respect to her employment, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

**FACTUAL ALLEGATIONS**

22. Around May 2018, the COMPANY hired Plaintiff as a per diem ABA provider to counsel children with autism.

23. At all times material, the COMPANY was aware of Plaintiff's interest in obtaining a full-time position with health benefits.  Even during Plaintiff's interview for the per diem position, she asked about full-time opportunities, and TILSON explained that if Plaintiff performed well as

a part-time worker, she would be promoted to a full-time position.

24. Plaintiff received initial training or orientation at THE HAND IN HAND EARLY CHILDHOOD CENTER.  She then regularly returned there to drop off paperwork and meet with her supervisors.

25. As a per diem worker, Plaintiff performed competently and diligently at all times, eagerly taking on all assignments offered to her (even cases that other employees turned down).

26. In light of Plaintiff's good performance, on about August 1, 2018, the COMPANY offered her a full-time ABA provider position with health benefits.

27. The terms of Plaintiff's position and salary were memorialized in a July 1, 2019 "Employment Agreement" (the "Agreement") whose opening sentence states that it was entered into by C.A.R.E.S., the Hand-in-Hand Early Childhood Program (defined collectively with C.A.R.E.S. as "the Company"), and Plaintiff.

28. The Agreement states that it is to remain in effect until August 31, 2019.

29. The Agreement stated that Plaintiff's weekly work schedule "shall be as agreed upon with the Program Director or designee," and "shall generally be forty (40) hours per week."

30. Tellingly, while the Agreement states that Plaintiff's "duties and responsibilities in this position" are "set forth on the attached Roles and Responsibilities as Schedule A hereto, which shall be deemed incorporated herein by reference,"  there was no Schedule A attached.

31. The Agreement states that Plaintiff's weekly work schedule "shall be as agreed upon with the Program Director or designee," and "alterations in your work schedule should be pre- arranged with the Program Director, or designee."

32. The COMPANY's Field Supervisor ESPONDA, Program Director TILSON, and Director CHAIM LAX assigned cases to Plaintiff each week but at no time set a required amount of hours that Plaintiff had to work each week.

33. During Plaintiff's time at the Company, its full-time ABA providers were generally given three cases (*i.e.*, students) by the Program Director and saw each student for approximately two hours each day, Monday through Friday. Students frequently canceled or rescheduled their appointments, and full-time employees often worked less than forty hours per week.

34. Thereafter, Plaintiff's performance was at all times exemplary; she worked her assigned cases, was commended by ESPONDA on her work, and had no disciplinary problems or negative comments.

35. Around November 2, 2018, Plaintiff learned she was pregnant with her first child, with an approximate due date of July 11, 2019.

36. Plaintiff had had only a 4% chance of getting pregnant, because of her advanced age.  The pregnancy was also classified as "high-risk" by her doctors because of a misshapen placenta. Additionally, Plaintiff suffered from severe nausea throughout her pregnancy.

37. In light of the risks of her pregnancy, Plaintiff did not reveal it to most people for several months.

38. In December 2018, Plaintiff told Program Director TILSON about her high-risk pregnancy during a personal conversation.  TILSON'S immediate response was to ask:  "how are you going to do this job pregnant?"

39. TILSON later forwarded Program Director MOSKOWITZ'S contact information to Plaintiff, and indicated that MOSKOWITZ was the person to contact for any information needed about pregnancy-related leave or benefits.

40. Around January 21, 2019, Plaintiff informed MOSKOWITZ that she was expecting a baby in mid-July, and requested maternity, disability, New York State Paid Family Medical Leave, and FMLA information (hereinafter referred to as "pregnancy leave information").

41. At all times material, MOSKOWITZ and the COMPANY as a whole intentionally ignored

Plaintiff's pregnancy leave information request and never provided Plaintiff with any of the requested information.

42. Additionally, on or about February 22, 2019, Plaintiff asked to leave early on February 27 and 28, 2019 to attend necessary doctor's appointments for her high-risk pregnancy.

43. Program Director TILSON responded to Plaintiff via e-mail on February 25, 2019: "I know how difficult it is to work when pregnant!" but "we are not able to make special accommodations for the appointments," because "you have been working so little hours for the past few months." In fact, Plaintiff could not reasonably have worked more hours before that, since the clients (students) she treated were often late or cancelled at the last minute. And as Plaintiff's initial e-mail to TILSON noted, she had only recently been assigned additional clients so that her schedule would be more "full."

44. Around February 25, 2019, Plaintiff sent another e-mail to MOSKOWITZ and HR Supervisor ANGULO stating: "I was hoping I can get the information I was looking for. Also, I need the disability forms."

45. The COMPANY intentionally ignored Plaintiff's request for pregnancy leave information and failed to provide Plaintiff with the requested information.

46. Instead, on February 26, 2019, ANGULO asked Plaintiff "when are you going on maternity?" Plaintiff responded that day by informing Defendants that she intended to work until that July.

47. Plaintiff was under extreme stress with her pregnancy due date nearing and she grew more concerned by the COMPANY's failure to acknowledge and/or respond to her pregnancy leave information requests.

48. Around March 13, 2019, Plaintiff informed MOSKOWITZ, ANGULO, and Program Director TILSON that she had decided to take maternity leave a few weeks earlier than previously planned, starting in mid-June, and that she needed pregnancy leave information.

49. These Defendants, and the COMPANY as whole, again refused to acknowledge and provide Plaintiff with any information regarding maternity leave.

50. Around March 19, 2019, Plaintiff underwent an emergency surgery and her doctor ordered her to remain on bed rest that entire week.  Plaintiff promptly informed Defendants about her surgery and bed rest order.

51. Around March 25, 2019, TILSON asked Plaintiff via text message if she planned to return to work.  Plaintiff confirmed her return and asked TILSON to send the COMPANY an e-mail regarding Plaintiff's pregnancy leave information because the COMPANY continued to deliberately ignore her requests for that information.

52. Program Director TILSON ignored Plaintiff's request and never responded.

53. Instead, within a few hours of Plaintiff's request to TILSON, and only twelve days after Defendants received notice Plaintiff was taking maternity leave early, the COMPANY issued a formal letter terminating Plaintiff's Agreement and demoting her back to a per diem position – thereby also cutting off her health insurance.

54. Additionally, STATFELD asked if Plaintiff wished to keep her current cases or have them reassigned.  Plaintiff responded that she wanted to keep her cases.

55. Plaintiff was shocked by the COMPANY's sudden and unwarranted decision to demote her.

56. Between March 25 and April 1, 2019, Plaintiff suffered from extreme anxiety and stress knowing that she would be without health benefits for the remainder of her pregnancy and for the birth of her child.

57. On or about April 1, 2019, Plaintiff attempted to speak with STATFELD regarding the COMPANY's decision to unlawfully demote Plaintiff to part-time status.

58. STATFELD refused to meet with Plaintiff.

59. Later that day, at 2:47 PM, Plaintiff e-mailed STATFELD:  "[t]his is an emergency since you

have decided to end my health insurance as of today and I am six months pregnant. . . . This is causing me a lot of stress while pregnant.  I would appreciate it if you could take the time to come out and speak with me."

60. STATFELD continued to refuse to meet with Plaintiff.

61. Approximately thirty minutes later, Plaintiff sent a second e-mail to STATFELD stating:  "I have [] been here in the office for an hour wanting to speak with you.  A number of people have let you know I am here. I am six months pregnant. It is not easy for me to sit here like this.  I also have a doctor's appointment I will be missing . . . to sit here.  You stated in your email that I can come speak with you with any questions I have.  Once again, this is an emergency as you are ending my health insurance today."

62. Finally, CEO LEAH LAX callously e-mailed Plaintiff:  "make an appointment to speak with Beth [STATFELD]."

63. On or about April 1, 2019, Plaintiff responded to LEAH LAX, copying TILSON and STATFELD, and stated:  "I am six months pregnant, as you know. You have chosen to end my health insurance today.  I need to speak with someone.  This is a lot of stress to put on a pregnant woman."

64. LEAH LAX responded, without any colorable basis:  "I was under the impression that you no longer wanted to pay for the insurance if that is [sic] not accurate and you do wish to have health insurance deducted from your billing, please advise."

65. Around April 2, 2019, Plaintiff informed the COMPANY via e-mail:  "I have never stated to anyone at any time that I no longer wanted my health insurance. . . . It is absurd to think that when I am six months pregnant.  Let's be clear so there is no confusion.  Not only did I not want my insurance changed, I also expect to get all my benefits back including my maternity leave/short term disability, and keep my status as a full time employee until after my maternity

9

leave.  I need to know if my health insurance is paid for and active as of today.  I need this information ASAP as I am six months pregnant.  I will be in the office tomorrow at 10:00 am to speak with Beth [STATFELD] on these matters."

66. In a meeting on or around April 4, 2019, STATFELD stated that it had been brought to her attention in January that Plaintiff was not working sufficient hours.  STATFELD did not explain why she did not insist that Plaintiff take additional cases then, or why she waited until March to reprimand and terminate Plaintiff.

67. Around April 5, 2019, LEAH LAX reprimanded Plaintiff for turning down work on March 19, 2019 – the day when Plaintiff underwent emergency surgery.

68. Around April 10, 2019, Defendants falsely and outrageously accused Plaintiff by e-mail of "defaulting on an agreement" by "turning down all offered work" and further stated:  "We therefore assume this fraudulent intention was your plan from day 1," and "we want you to be clear that we are not open to being exploited by you any longer."

69. Defendants also informed Plaintiff:  "as a part time employee you are not entitled to health insurance please reply within 24 hours whether you wish to pay for insurance as a part time employee or it will be terminated."  Plaintiff responded:  "yes, I will be needing COBRA."

70. By demanding that Plaintiff decide within 24 hours whether or not she wanted COBRA coverage, Defendants violated COBRA'S notice requirements.

71. At that time, Plaintiff's supervisors TILSON and ESPONDA discontinued all communication with her, and Plaintiff learned shortly thereafter that the COMPANY assigned a new supervisor to Plaintiff.

72. Defendants never explained what they were referring to by "fraudulent intention" or "being exploited," or how she was "defaulting on an agreement."

73. But Plaintiff is aware of at least one other therapist who worked for Defendants and was caught

falsifying the number of hours she reported working – but was not disciplined, terminated, or reported to any relevant authorities like the New York City Department of Health and Mental Hygiene, the New York City Division of Family and Child Health, or the New York City Department of Investigation (DOI). Upon information and belief, the other therapist was not fired or reported because she was not pregnant and not requesting accommodation of a pregnancy or disability.

74. On or about April 25, 2019, Plaintiff once again asked the COMPANY for pregnancy leave information, as well as for information regarding the change in her insurance coverage.

75. On or about April 29, 2019, with no explanation, the COMPANY told Plaintiff that her health insurance was ending effective April 30, and that she would need to pay exorbitant monthly premiums effective immediately for continued insurance coverage.

76. Additionally, without Plaintiff's consent, the COMPANY deducted $600 from Plaintiff's prior paycheck to pay for her health insurance.

77. Defendants failed to provide Plaintiff with adequate notice of changes to her health insurance benefits as required under COBRA, and upon information and belief, likewise failed to provide adequate notice to Plaintiff's group health plan, as also required under COBRA.

78. Plaintiff's husband, who was also on her insurance plan, never received any notice that his benefits would change or be canceled.

79. On or about May 6, 2019, the COMPANY failed to pay Plaintiff for the entire week of March 25, 2019, and for a number of hours she had worked in April 2019.

80. That same day, unable to cope with Defendants' repeated abuses, failures to timely pay her the wages she had earned, provide the benefits she had been promised, or furnish the information she had requested, Plaintiff resigned her employment.

81. Defendants constructively discharged Plaintiff. *See, e.g., Dean v. Westchester County Dist.*

*Attorney's Office*, 119 F. Supp. 2d 424, 431 (S.D.N.Y. 2000) ("A demotion with a reduction
in pay and loss of employee benefits, when accompanied by evidence of malicious intent, can
establish constructive discharge.")

82. Thereafter, the COMPANY continued to withhold Plaintiff's paycheck and Defendants failed
to provide Plaintiff with any explanation and/or information regarding her insurance coverage
and pregnancy leave.

83. On June 1, 2019, Plaintiff delivered her child prematurely.

84. Defendants unlawfully discriminated against Plaintiff on the basis of her gender, pregnancy,
and/or disability, as well as her repeated requests for reasonable accommodation of her
pregnancy/disability by (among other things) failing to provide Plaintiff with the information
or leave she requested, or any other reasonable accommodation of her high-risk pregnancy,
and by constructively discharging her.

85. Defendants unlawfully subjected Plaintiff to a hostile work environment on the basis of her
gender and pregnancy and her repeated requests for reasonable accommodation of her high-
risk pregnancy/disability.

86. Defendants unlawfully retaliated against Plaintiff for engaging in the protected activities of
requesting reasonable accommodation of her pregnancy/disability, requesting information on
leave related to her pregnancy/disability, and complaining about Defendants' harassment and
refusals to provide her with information regarding leave, by (among other things) failing to
provide Plaintiff with information, leave, or any other reasonable accommodation of her high-
risk pregnancy, and by constructively discharging her.

87. The above are just some of the examples of unlawful discrimination, harassment, and
retaliation to which Defendants subjected Plaintiff.

88. Plaintiff claims a continuous practice of discrimination and claims a continuing violation

and makes all claims herein under the continuing violations doctrine.

89. In the event Defendants claim or the Court determines that Plaintiff was an independent contractor, Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to independent contractors. Furthermore, in such case, Plaintiff claims that Defendants owed and breached their duty to Plaintiff to prevent or rectify the discrimination, harassment, and retaliation she suffered.

90. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, benefits, and other compensation that such employment entails.

91. As a result of the acts and conduct complained of herein, Plaintiff has also suffered and will continue to suffer emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

92. Defendants' unlawful conduct caused Plaintiff to be humiliated, degraded, victimized, embarrassed, and emotionally distressed, and Plaintiff suffered and continues to suffer emotional distress and physical ailments, and the exacerbation of any preexisting conditions.

93. Plaintiff has also been treated by a mental health therapist on numerous occasions since Defendants first demoted her unlawfully.

94. Plaintiff is in possession of materials to further support the claims made herein.

95. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against the COMPANY.

96. Plaintiff demands reinstatement.

**FIRST CAUSE OF ACTION**
**TITLE VII/PREGNANCY DISCRIMINATION ACT – DISCRIMINATION**
**(Not Against the Individual Defendants)**

97. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

Complaint with the same force and effect as if fully set forth herein.

98. Title VII, 42 U.S.C. § 2000e-2(a), states in relevant part as follows:  "It shall be an unlawful employment practice for an employer":  (1) "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," or (2) "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex."

99. The Pregnancy Discrimination Act amends Title VII to prohibit discrimination "on the basis of pregnancy, childbirth, or related medical conditions"; it mandates that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same [as other persons] for all employment-related purposes, including receipt of benefits under fringe benefit programs . . . ."  42 U.S.C. § 2000e(k).

100. The entity Defendants refused to provide Plaintiff with information regarding pregnancy leave and benefits that she needed and requested, failed to retain Plaintiff as a full-time employee and demoted her back to per diem status on the basis of her pregnancy, and then constructively discharged Plaintiff because she was pregnant.

101. These Defendants thereby engaged in discriminatory employment practices prohibited by Title VII and the Pregnancy Discrimination Act.

102. These Defendants thereby violated the above provision and Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## SECOND CAUSE OF ACTION
## TITLE VII/PREGNANCY DISCRIMINATION ACT – HOSTILE WORK ENVIRONMENT
### (Not Against the Individual Defendants)

103.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully stated herein.

104.  The individual Defendants repeatedly harassed, belittled, and disparaged Plaintiff – explicitly on the basis of her pregnancy and pregnancy-related disabilities – thereby creating a hostile work environment for Plaintiff.

105.  Each of the entity Defendants knew about, and encouraged or ratified, the individual Defendants' inappropriate and unlawful harassment before, during, and after it occurred, even after Plaintiff complained about such conduct.

106.  By encouraging, tolerating, or abetting these repeated acts of harassment, the entity Defendants created, maintained, and subjected Plaintiff to an unlawful hostile work environment in violation of Title VII and the Pregnancy Discrimination Act.

107.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## THIRD CAUSE OF ACTION
## TITLE VII/PREGNANCY DISCRIMINATION ACT – RETALIATION
### (Not Against the Individual Defendants)

108.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

109.  Within hours of Plaintiff's request that TILSON e-mail the COMPANY on Plaintiff's behalf for pregnancy leave information, and only twelve days after the entity Defendants received notice Plaintiff was taking maternity leave early, the COMPANY terminated Plaintiff's Agreement, demoted her to a part-time position, and constructively discharged her.

110. These Defendants had no reason to treat Plaintiff in this fashion, nor any colorable basis for demoting her. The only plausible explanation for these Defendants' conduct is that they were retaliating against Plaintiff for her complaints about discrimination and requests for accommodation of her pregnancy.

111. These Defendants thereby retaliated against Plaintiff in violation of Title VII and the Pregnancy Discrimination Act, and Plaintiff suffered numerous damages as a result, including loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

**FOURTH CAUSE OF ACTION**
**NEW YORK STATE HUMAN RIGHTS LAW – DISCRIMINATION**

112. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

113. The NYSHRL makes it an "unlawful discriminatory practice" for any employer to discriminate against any individual "in terms, conditions or privileges of employment" based on sex or disability. N.Y. Exec. Law § 296(1)(a).

114. While the NYSHRL does not explicitly name pregnancy as a protected classification, pregnancy-based discrimination falls within its prohibitions of sex or gender discrimination. *See, e.g., Mittl v. N.Y. State Div. of Human Rights*, 100 N.Y.2d 326, 330 (2003).

115. By demoting and terminating Plaintiff because of her pregnancy, each of the Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment in violation of the NYSHRL.

116. Plaintiff suffered numerous damages as a result, including loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## FIFTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW – HOSTILE WORK ENVIRONMENT

117.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

118.  By harassing Plaintiff and subjecting her to a hostile work environment because of her sex, disability, and pregnancy, or by encouraging, tolerating, or abetting acts of harassment against Plaintiff by other Defendants, each of the Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment in violation of the NYSHRL.

119.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## SIXTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW – RETALIATION

120.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

121.  The NYSHRL provides in pertinent part that it shall be an unlawful discriminatory practice "[f]or any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article."  N.Y. Executive Law § 297.

122.  Within a few hours of Plaintiff's request to TILSON to e-mail the COMPANY regarding pregnancy leave information, and only twelve days after the COMPANY received notice that Plaintiff was taking maternity leave early, the COMPANY terminated Plaintiff's Agreement, demoted her to a part-time position, and constructively discharged her.

123.  Additionally, within weeks of Plaintiff complaining about and attempting to speak to Defendants about her discriminatory demotion, loss of benefits, and mistreatment, Defendants

also pretextually reprimanded Plaintiff for not having worked sufficient hours months earlier and when she was undergoing surgery, falsely accused her of fraud, and then informed Plaintiff that she was no longer entitled to health insurance and gave her only 24 hours to decide whether or not she wanted COBRA coverage.

124. Defendants had no reason to treat Plaintiff in this fashion, nor any colorable basis for demoting her.  The only plausible explanation for Defendants' conduct is that they were retaliating against Plaintiff for her complaints about discrimination and her requests for accommodation of her pregnancy/disability.

125. Defendants thereby engaged in an unlawful retaliation against Plaintiff in violation of the NYSHRL, and Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## SEVENTH CAUSE OF ACTION
## NEW YORK STATE HUMAN RIGHTS LAW – AIDING AND ABETTING

126. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

127. The NYSHRL provides in pertinent part that it shall be an unlawful discriminatory practice "[f]or any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."  N.Y. Executive Law § 296(6).

128. Each Defendant violated this provision by aiding, abetting, inciting, compelling, or coercing some or all of the unlawful discrimination or retaliation carried out by some or all of the other Defendants, as described above, and Plaintiff suffered numerous damages as a result, including loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## EIGHTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – DISCRIMINATION

129.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

130.  The NYCHRL, Administrative Code Section 8-107(1), makes it an "unlawful discriminatory practice" for any "employer or an employee or agent thereof" to discriminate in terms, conditions, or privileges of employment on the basis of sex or gender. "Pregnancy discrimination is a form of gender discrimination under the NYCHRL." *Chauca v. Abraham*, 841 F.3d 86, 90 n.2 (2d Cir. 2016), *as amended* (Nov. 8, 2016).

131.  The NYCHRL, Section 8-107(22), requires employers to make reasonable accommodations for pregnant individuals, and Section 8-107(15) requires employers to make reasonable accommodations for disabled individuals.

132.  To prevail on a NYCHRL discrimination claim, an employee need only show "differential treatment" – that she was "treated less well" because of a discriminatory intent, whether through a "tangible" employment action such as firing, or through workplace harassment, which need not be "severe or pervasive." *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 625-26 (E.D.N.Y. 2017), *aff'd*, 752 Fed. App'x 64 (2d Cir. 2018).

133.  Defendants violated the NYCHRL by tolerating or encouraging the harassment of Plaintiff on the basis of her pregnancy/disability, terminating her agreement, demoting her, and ultimately constructively discharging her, as set forth herein.

134.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## NINTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – RETALIATION

135.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

136.  The NYCHRL makes it an "unlawful discriminatory practice" for any employer to "discriminate against any person because such person has opposed any practices forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7).

137.  Defendants violated this provision by discriminating against, harassing, demoting, and constructively discharging Plaintiff because she requested a reasonable accommodation of her pregnancy/disability, and because she complained about the harassment described above.

138.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## TENTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – INTERFERENCE

139.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

140.  The NYCHRL makes it an "unlawful discriminatory practice" for "any person" to "coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section." N.Y.C. Admin. Code § 8-107(19).

141.  By harassing, demoting, and constructively discharging Plaintiff because she requested a reasonable accommodation of her pregnancy/disability, Defendants coerced or interfered with Plaintiff's enjoyment of her rights under the NYCHRL.

142. Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## ELEVENTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – AIDING AND ABETTING

143. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

144. The NYCHRL makes it an "unlawful discriminatory practice" for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."  N.Y.C. Admin. Code § 8-107(6).

145. As described above, each of the Defendants violated this provision by aiding, abetting, inciting, compelling, or coercing the harassing and retaliatory conduct described above.

146. Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## TWELFTH CAUSE OF ACTION
## NEW YORK CITY HUMAN RIGHTS LAW – EMPLOYER LIABILITY

147. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

148. The NYCHRL provides for "Employer liability for discriminatory conduct by employee, agent, or independent contractor" where:  "(1) the employee or agent exercised managerial or supervisory responsibility"; or "(2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action"; or "(3) the employer should have known of the employee's or

agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct." N.Y.C. Admin. Code § 8-107(13).

149. As described above, the Company and its employees or agents who exercised managerial or supervisory responsibility over Plaintiff or her work either engaged in, or else were aware or reasonably should have known of other employees' or agents' harassing and retaliatory conduct toward Plaintiff, but acquiesced in such conduct or failed to exercise reasonable diligence to prevent such conduct.

150. Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits as a result of her demotion and constructive discharge, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## THIRTEENTH CAUSE OF ACTION
## COBRA – FAILURE TO PROVIDE NOTICE

151. COBRA, 29 U.S.C. §§ 1161 & 1163(2), provides that an employer must allow former employees to continue health care coverage under the employer's plan if certain qualifying events occur, including termination.

152. Under COBRA, the employer must also notify a terminated employee of the right to elect continuing health coverage under the employer's group rate. 29 U.S.C. § 1166(a).

153. COBRA entitles employees to at least sixty days to elect COBRA continuation coverage. *See* 29 U.S.C.A. § 1165(1).

154. When a covered employee is terminated, the employer must also notify the group health plan administrator within thirty days of such termination. 29 U.S.C. § 1166(a)(1)).

155. Upon information and belief, Defendants failed to promptly notify Plaintiff or their health plan administrator of Plaintiff's termination.

156.  Defendants also failed to allow Plaintiff 60 days to decide whether she wanted COBRA coverage, instead allowing her only 24 hours whether she wanted such coverage.

157.  Defendants' failures were the result of their discriminatory and retaliatory intent, and thus constituted bad faith or intentional conduct, as demonstrated by the number of requests for information Plaintiff was compelled to make.

158.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income and benefits, humiliation and severe emotional distress, and unknown consequences to her unborn child.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EMPLOYMENT CONTRACT

159.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

160.  The Agreement between Plaintiff and the Company was a contract binding upon them.

161.  Plaintiff competently performed her duties under the Agreement, particularly all of the cases assigned to her, and at all times followed the weekly work schedule agreed upon with Defendants' Program Director or her designee, arranging any alterations in that schedule with the Program Director or designee as the Agreement required.

162.  Defendants are accordingly bound by the Agreement to pay Plaintiff the salary and benefits they promised her.

163.  Defendants failed to furnish Plaintiff with sufficient cases or to schedule her for sufficient work hours to satisfy her contractual obligations, thereby rendering Plaintiff's performance of the contract impossible.  Defendants then blamed Plaintiff for failing to perform work they had not provided her, and unlawfully breached the parties' Agreement by failing to provide Plaintiff with

information regarding pregnancy and disability leave and benefits, reducing Plaintiff's pay and

benefits, demoting Plaintiff to per diem status, and constructively discharging Plaintiff.

164.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income

and benefits as a result of her demotion and constructive discharge, humiliation and severe

emotional distress, and unknown consequences to her unborn child.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

165.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

Complaint with the same force and effect as if fully set forth herein.

166.  The Agreement between Plaintiff and the Company was a contract binding upon them; as such,

it inherently included an implied covenant of good faith and fair dealing.

167.  Plaintiff competently performed her duties under the Agreement, particularly all of the cases

assigned to her, and at all times followed the weekly work schedule agreed upon with

Defendants' Program Director or her designee, arranging any alterations in that schedule with

the Program Director or designee as the Agreement required.

168.  Defendants then breached their duties under the implied covenant of good faith and fair

dealing, by failing to furnish Plaintiff with sufficient cases or to schedule her for sufficient work

hours to satisfy her contractual obligations, thereby rendering Plaintiff's performance of the

contract impossible, then blaming Plaintiff for failing to perform work they had not provided her

so they could reduce Plaintiff's pay and benefits, demote Plaintiff to be a per diem worker, and

constructively discharge Plaintiff.

169.  Plaintiff suffered numerous damages as a result, including but not limited to loss of income

and benefits as a result of her demotion and constructive discharge, humiliation and severe

emotional distress, and unknown consequences to her unborn child.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, in an amount to be determined at the time of trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for reinstatement to her prior position; and for such other relief as the Court deems just and proper.

**JURY DEMAND:**  Plaintiff demands a jury trial on all issues to be tried.

Dated: New York, New York
       May 22, 2020

**DEREK SMITH LAW GROUP, PLLC**

 _/ s / Daniel S. Kirschbaum_
Daniel S. Kirschbaum, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119
(212) 587-0760

*Attorneys for Plaintiff*